Filed 9/19/14  In re Cheyenne C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| In re CHEYENNE C., a Person Coming Under the Juvenile Court Law. | B252940 |
| | (Los Angeles County Super. Ct. No. CK97074) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.C., Defendant and Appellant. | |


APPEAL from orders of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

D.C. (Father) appeals jurisdictional and dispositional orders of the juvenile court maintaining jurisdiction over his daughter, Cheyenne C. (born in May 2000), and removing her from his custody. Because we conclude that substantial evidence supports the juvenile court's findings that Cheyenne should remain in her mother's custody and that continuing dependency jurisdiction was required to safeguard Cheyenne's well-being, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Initiation of Dependency Proceedings

Cheyenne is the child of Father and Miriam S. (Mother). On October 19, 2012, the Los Angeles County Department of Children and Family Services (DCFS) investigated a referral alleging that Mother emotionally abused 12-year-old Cheyenne and 16-year-old Sydney, and that there was ongoing conflict and physical abuse between Mother and Father, who had been separated for six years and divorced for two years. The parents had joint legal and physical custody of the girls, but both girls lived with Mother. When interviewed, Cheyenne, Sydney, and Mother all reported that Father was verbally abusive, calling them fat and worthless. Both children denied any emotional abuse by Mother.

Cheyenne had suffered anxiety attacks since the age of four and had been hospitalized in psychiatric facilities several times. She received outpatient psychiatric treatment and took prescribed antidepressant medication. Shortly before the referral, on October 11, 2012, Cheyenne had been admitted to Aurora Charter Oak Behavioral Health Center, suffering from major depressive disorder and suicidal thoughts. While there, she was fixated on the fear that Father would try to take her from the hospital. She remained hospitalized for six days.

2

Cheyenne reported that she loved Father and wanted to see him, but that he was verbally aggressive and needed psychiatric care. She said his behavior caused her anxiety and he smoked too much marijuana.

In December 2012, a second referral was made by a police officer after a domestic violence incident. The parents had met to discuss problems Sydney was having in school. Both girls were present. Father blamed Mother for the problems and began denigrating Mother and Sydney. Sydney told him to "shut up" and spat in his face. Father put Sydney in a headlock and she punched him. Father tried to punch her and pushed her off the porch, causing her head to strike a pole. Mother intervened, and he forcefully grabbed her arm and shoved her off the porch and onto the ground. He shoved Mother down repeatedly when she tried to get up. Both parents had scratches, but Mother had extensive cuts and scrapes and a bruised eye where Father had punched her. Father was deemed the dominant aggressor and was placed under arrest. The police officer reported that law enforcement had been to Father's home about eight times for various reasons. Father was "very aggressive" with the police and engaged in disruptive behavior when he was taken to jail. Father was released on bail. Father later said that he was just trying to defend himself. Mother reported that Father suffers from bipolar disorder for which he takes medication.

Cheyenne reported that the incident was scary and depressing. She had been enjoying visiting Father and felt they understood one another. He had never threatened or hit her. Cheyenne said Father was a different person around Mother.

A social worker interviewed Father after his release from jail. He was argumentative and would not discuss the allegations of emotional abuse or Cheyenne's nervous breakdown. He denied abusing the children and said they would be better off in his custody. He said he planned to seek sole custody of Cheyenne. Father had been seeing a psychiatrist since 2006 for bipolar disorder and was prescribed psychotropic medications. His psychiatrist confirmed he was compliant with medication, treatment, and recommendations.

3

DCFS filed a Welfare and Institutions Code section 300 petition on behalf of Sydney and Cheyenne on December 24, 2012, alleging Father emotionally abused Cheyenne and physically abused Sydney and Mother.[1]

## II. The Detention Hearing

On December 24, 2012, the juvenile court detained the children from Father, released them to Mother pending the next hearing, and ordered DCFS to provide Father with reunification services and Mother with family maintenance services. The court ordered no visitation for Father pending further order of the court. On January 8, 2013, the juvenile court issued a temporary restraining order protecting Mother and the children from Father.

DCFS interviewed Cheyenne, Sydney, Mother, and Father for the January 23, 2013 jurisdiction and disposition report. Cheyenne said she did not want to discuss Father's emotionally abusive behavior. She said she loved her father, had a history of depression, and experienced anxiety attacks before school. Sydney said Father had been emotionally abusive to her and Cheyenne, causing Cheyenne to have panic attacks. She added that Cheyenne had suicidal thoughts, a history of depression, and several psychiatric hospitalizations. Mother said Father tended to manipulate Cheyenne, and noted the child had been hospitalized for depression and suicidal thoughts.

Father denied emotionally abusing Cheyenne, but acknowledged she had emotional problems and a history of depression. He stated, "I want full custody of . . . Cheyenne. I am unwilling to do any more programs. I have already done parenting before. If I have to do any more programs then I will just give up custody [of] both of my children."

---

[1] All further statutory references are to the Welfare and Institutions Code.

## III.    The Jurisdiction Hearing

On June 7, 2013, the juvenile court sustained the section 300 petition and issued a restraining order against Father through June 7, 2016.[2]  Specifically, the court sustained allegations that:  (1) Father had physically abused Sydney, endangering her physical health, safety, and well-being, creating a detrimental home environment, and placing Sydney and Cheyenne at risk of future harm (§ 300, subds. (a), (b), (j)); and (2) Sydney and Cheyenne were exposed to a violent altercation between their parents, which resulted in injury to Mother and arrest of Father, endangering the children's physical health and safety and placing them at risk of harm (*id.*, § 300, subds. (a), (b)).

On August 29, 2013, DCFS reported that Father had not visited Cheyenne since December 24, 2012, because he refused to have monitored visits at DCFS's offices.  On October 21, 2013, DCFS said Father had a monitored visit with Cheyenne at a mall on September 21, 2013, and that Cheyenne said she wanted to have telephonic contact with Father.  Cheyenne reported being happy living with Mother, but said she missed Father and "I miss living with my father because at his house I have my own bedroom; at my mother's I sleep on an air mattress."  Cheyenne had not experienced any recent anxiety attacks, and her psychiatrist was considering discontinuing her Zoloft prescription.  Father said he would participate in conjoint counseling with Cheyenne "for a short period of time if it leads to full custody."  DCFS noted Father had been very uncooperative and angry, placing all the blame for case issues on Sydney and Mother.

## IV.    The Disposition Hearing

On October 23, 2013, Cheyenne testified she had been living with Mother for the last three years.  She denied being afraid of Father and said, "I love my Dad."  Cheyenne testified she had numerous monitored telephone calls with Father that were "a lot of fun," but last visited with him in person in December 2012 (perhaps forgetting the visit on September 21, 2013).  When asked where she preferred to live, she answered, "With my

---

[2]     The restraining order permitted Father to have supervised visits with Cheyenne at DCFS's offices.

Dad." She added, "I miss [Father] dearly and I would have more privacy and space," explaining that she had her own room at Father's home, but had to sleep in the living room at Mother's home. Cheyenne's counsel also asked if Cheyenne would want to have more contact with Father, i.e., not live with him but have unmonitored visits or revert back to a custody situation where she was able to spend more time with Father. She responded, "Yes." She said she had been hospitalized when she was having overnight visits with Father, but had not been hospitalized or experienced any anxiety attacks since visits with him ceased.

Counsel for DCFS asked the juvenile court to remove Cheyenne and Sydney from Father's custody and terminate its jurisdiction through a family law order giving Mother sole legal and physical custody of both children. Counsel for the children recommended Mother be given sole legal and physical custody, and Father be granted unmonitored visits with Cheyenne in a neutral setting until visits safely could be liberalized. Mother's counsel joined in the requests of DCFS's and children's counsel, but asked that Cheyenne's visits with Father be supervised by a professional monitor. Father's counsel said Father was willing to participate in conjoint counseling with Cheyenne and asked that she be placed with Father. Counsel for DCFS then asked the juvenile court to keep Cheyenne's case open in order to ensure Father was appropriate during visits and the child was not being adversely affected.

The juvenile court declared Cheyenne and Sydney dependents of the juvenile court, removed them from Father, and placed them with Mother. As to Sydney, the court granted Mother sole physical and legal custody, terminated jurisdiction, and ordered that Father have no visitation. With respect to Cheyenne, the juvenile court noted Father had not "done his part in terms of addressing the issues that brought the matter before the court," and said it would not terminate jurisdiction because it would be inappropriate to order visitation for Father and not have the "follow through to make sure that . . . those visits go well."

Father's counsel asked the juvenile court to order conjoint counseling between Father and Cheyenne, but not a parenting class. The juvenile court ordered Father to

6

enroll in individual counseling to address case issues, take all of his prescribed psychotropic medications, participate in Project Fatherhood, and participate in conjoint counseling with Cheyenne. The court granted Father two monitored visits with Cheyenne per week, with an additional hour of unmonitored visitation per week in a neutral setting if he remained compliant with his case plan. The court ordered Cheyenne to participate in individual counseling to address case issues, undergo conjoint counseling with Father at the discretion of her therapist, and take all prescribed psychotropic medications. Father's counsel objected to the juvenile court's dispositional findings removing Cheyenne from Father's care and ordering Father to participate in programs.

The juvenile court set a section 364 review hearing for April 23, 2014. On October 24, 2013, the juvenile court modified the restraining order to allow Father to visit Cheyenne.

This timely appeal followed.

## DISCUSSION

### I. The Juvenile Court Did Not Abuse Its Discretion by Placing Cheyenne With Mother

Father argues that the juvenile court abused its discretion by ordering Cheyenne removed from his custody pursuant to section 361, subdivision (c), noting that as of the October 2013 hearing, the circumstances necessitating dependency jurisdiction were unlikely to reoccur. For the reasons that follow, we disagree.

We note as an initial matter that father errs in suggesting that section 361, subdivision (c) governed the juvenile court's power to place Cheyenne outside his care. Section 361, subdivision (c) authorizes a juvenile court to remove a dependent child "from the physical custody of his or her parents or guardian or guardians *with whom the child resides* at the time the petition was initiated." (Italics added.) Here, although it is undisputed that Mother and Father shared the *right* to joint legal and physical custody of Cheyenne, Cheyenne testified that she had been living with Mother for three years, and

7

she had last lived with Father four years earlier when her parents were still married. Mother thus was the parent with whom Cheyenne resided at the time the petition was initiated, and section 361, subdivision (c) is irrelevant to the disposition as to Father.

Had the juvenile court removed Cheyenne from Mother's custody, it could have ordered Cheyenne placed with Father pursuant to section 361.2, subdivision (a), which provides that when a court orders removal of a child, it shall determine "whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." The juvenile court never considered removing Cheyenne from Mother's custody, however, nor could it have done so absent clear and convincing evidence that "[t]here is or would be a substantial danger to [Cheyenne's] physical health, safety, protection, or physical or emotional well-being . . . if [she] were returned home, and there [we]re no reasonable means by which [Cheyenne's] physical health c[ould] be protected without removing [Cheyenne] from [Mother's] physical custody." (§ 361, subd. (c)(1); see also *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) Father does not point to any evidence that there would be a substantial danger to Cheyenne's well-being if she remained with Mother, and we have found in the record no evidence to that effect. While it is true that Cheyenne said she preferred to live with Father because she missed him and wanted her own bedroom, she also said she would like it if she could continue to live with Mother but see Father more frequently. Given this testimony, there could be no finding that remaining with Mother would present a substantial danger to Cheyenne's well-being.

Because Cheyenne was not residing with Father at the time the petition was initiated, removal from him was not required.[3] Instead, the court simply determined that

---

[3] Because Cheyenne was not living with Father when the petition was initiated, the juvenile court erred in ordering Cheyenne "removed" from Father's custody pursuant to section 361, subdivision (c). That error was harmless, however. An appellate court "will

8

Cheyenne's placement with Mother continued to be appropriate. Substantial evidence clearly supports that decision. The record contained ample evidence that placement with Mother was preferable, and that placement with Father would be detrimental to Cheyenne's physical and emotional well-being. Father's behavior and the conflict among Cheyenne's family members plainly affected Cheyenne's already fragile emotional well-being. She had experienced anxiety attacks since the age of four, suffered a nervous breakdown, and been repeatedly hospitalized and prescribed antidepressants. Cheyenne said Father was aggressive and verbally abusive, calling her and Sydney names and putting them down about their grades, making Cheyenne feel nervous. Although Cheyenne had told Father his behavior caused her stress, he was not willing to change it.

Father also engaged in physically abusive conduct that posed a risk to Cheyenne's physical and emotional well-being. In December 2012, Cheyenne witnessed Father grab Sydney's arm, put her in a headlock, attempt to hit her in the face, throw her off the porch, and cause her head to hit a pole. She also saw Father punch Mother's face and throw her off the porch onto the ground, repeatedly shoving her down each time she tried to get up. Officer Cole described father as the "dominant aggressor" during the altercation, and indicated police had responded several times to Father's home for "one thing or another." When father was arrested, he was verbally aggressive and engaged in disruptive behavior. Father never took responsibility for his actions and blamed Mother and Sydney for everything. He had not visited Cheyenne in many months because he refused to take part in monitored visitation, choosing not to see her rather than capitulate to the juvenile court's requirements. Father's willingness to remedy his behavior for Cheyenne's benefit was questionable at best. While he indicated he was willing to do

not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result." (*In re Jonathan B.* (1992) 5 Ca1.App.4th 873, 876, citing *People v. Watson* (1956) 46 Ca1.2d 818, 836.) "[I]t is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, [an appellate court is] not concerned with the faults of the latter." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 330; accord *People v. Vera* (1997) 15 Cal.4th 269, 272.)

conjoint counseling with Cheyenne for a short period, he also said he was "unwilling to do any more programs," and said, "If I have to do any more programs then I will just give up custody [of] both of my children."

Cheyenne's emotional state had markedly improved by the time of the October 23, 2013 disposition hearing. Cheyenne testified that she had not visited with Father since December of 2012. During this period, her anxiety attacks had ceased. The progress may have been due to her not being subjected to Father's harmful behavior. A considerable reduction in the intense family conflict she had experienced before was also a likely factor in her improvement. As such, the juvenile court's placement of Cheyenne with Mother, with appropriate visitation with Father in accordance with Cheyenne's wishes, was an entirely suitable exercise of the juvenile court's discretion.

## II.    The Juvenile Court Did Not Abuse Its Discretion by Maintaining Jurisdiction Over Cheyenne

Father contends the juvenile court abused its discretion by failing to terminate dependency jurisdiction over Cheyenne, as it had done with Sydney, and as all counsel except for DCFS's counsel recommended. For the reasons that follow, we disagree.

DCFS urges that Father has forfeited the jurisdictional issue because he did not ask the juvenile court to terminate jurisdiction over Cheyenne and did not object when the court stated it would retain jurisdiction. We agree. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221.) Here, although Father requested that Cheyenne be placed in his care, he did not object to the juvenile court's continued jurisdiction over Cheyenne. As such, Father did indeed forfeit this argument for purposes of appeal.

In any event, we readily conclude that the juvenile court's decision to continue jurisdiction over Cheyenne should not be disturbed. As the juvenile court stated, it would have been imprudent to order visitation for Father without the power to ensure the visits were appropriate. Father's history of inflicting physical and emotional abuse was well-

10

established, and other than one brief visit at a mall in September 2013, he had not visited Cheyenne for 10 months. Providing the assistance of DCFS to implement visits was wise, given the history of conflict between Mother and Father whenever they interacted. Lack of supervision over Cheyenne's visits with Father could have exposed Cheyenne to further domestic violence and emotional abuse, the absence of which coincided directly with Cheyenne's marked improvement. The threat of harm to Cheyenne remained because Father had not taken measures to remedy his behavior, and the case correctly remained under court supervision to ensure Cheyenne's well-being as visits with him resumed.

We also reject Father's claim that continued jurisdiction was inappropriate because the circumstances that led to the proceedings no longer existed since the physical altercation with Mother and Sydney was an isolated incident. That incident was a culmination of years of conflict and tension between Mother and Father, and Father and Sydney. The record is replete with evidence that Father acted inappropriately by speaking harshly about Mother to Cheyenne and criticizing Cheyenne and Sydney. Yet, Father maintained that he did not need counseling or parenting education and that the family's problems were caused entirely by Mother and Sydney. Further, although Cheyenne had made clear to Father that his behavior caused her stress and had asked him to change, he had refused to do so. Father's aggressive conduct when the police responded to the incident of domestic violence provided further evidence that he did not consider himself accountable to anyone for how he acted. His obstinate refusal to attend monitored visits with Cheyenne is additional evidence of his destructive attitude. He demonstrated no insight or self-awareness into the consequences of his harmful behavior. It is apparent that Father's claim that the circumstances that led to the dependency were no longer present is inaccurate. We therefore conclude that the juvenile court was correct in continuing jurisdiction over Cheyenne and ordering a comprehensive reunification plan so that Father's behavior with Cheyenne could be monitored and he could have the opportunity to benefit from family reunification services.

11

### III. The Juvenile Court Did Not Abuse Its Discretion by Ordering Father to Participate in Counseling and Parenting Education

Father contends finally that the juvenile court abused its discretion by ordering him to participate in individual counseling and Project Fatherhood. We do not agree. Section 362 provides that "[i]f a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians *shall be required* to participate in child welfare services or services provided by an appropriate agency designated by the court." (Subd. (c), italics added.) Further, the juvenile court "may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . . That order may include *a direction to participate in a counseling or education program* . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (*Id*., § 362, subd. (d), italics added.) We review the court's order under this section for abuse of discretion. (*In re Austin P.* (2004) 118 Ca1.App.4th 1124, 1135.)

The juvenile court did not abuse its discretion by ordering father to participate in counseling and parenting education. Father had clearly demonstrated his need for individual counseling to address the issues that led to his volatile behavior. We presume the court ordered him to participate in Project Fatherhood to enable him to gain some insight into the ways his behavior affected his daughter and to learn more functional means to deal with conflict for Cheyenne's benefit. We thus find that the court's order that Father participate in Project Fatherhood and individual counseling was entirely reasonable.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.*

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.